Case No. 253799 J.M. Smucker Co v. Ace American Insurance Co Argument not to exceed 15 minutes per side Mr. Wadley, you may proceed Good morning, and may it please the Court. My name is Chris Wadley, and I represent Ace American Insurance Company. Your Honors, the District Court's decision in this case should be reversed, because its interpretation of the policy at issue reads the lot clause entirely out of the contract, which is contrary to Ohio principles of contract interpretation. The clause at issue in this case states that injury or damage shall be considered a single occurrence if three things are true. One, the injury or damage arises out of the product's completed operations hazard, which basically means its product's liability claim. Second, the injury or damage arises out of substantially the same general harmful condition, cause, defect, error, or suspected deficiency, which we agree is the case here, salmonella contamination in Smucker's peanut butter. And third, that the injury or damage arises out of one product, lot, which is also defined, the meaning of the word lot is defined in the clause. The District Court's interpretation of the policy effectively says that once you have a product's claim, and once you have injuries that arise out of the same general harmful condition, you stop there, because that's a single occurrence. Which means that the provision that says it must also arise out of one product, lot, is entirely meaningless in the contract. Are you saying then that there's no other way that that provision of arise out of one lot would apply hypothetically in any situation? I cannot think of one, and nor has Smucker presented one that is, I mean they've presented a couple of arguments, I don't think either is persuasive. The first argument that they said is that well, the lot clause also does another thing, which is it deems the occurrence to have taken place at the time of the occurrence of the first occurrence related to that lot. So if you have injuries arising out of the same lot that span multiple policy periods, you deem them all to have occurred at one time. Which is fine as far as it goes, but it doesn't really address our argument, which is that that's the second sentence of the clause. What we're talking about is the first sentence of the clause, which says that for injuries to be deemed a single occurrence, these three things must occur, one of which is they all have to arise out of the same lot. The second argument that they present is that well, it's possible that the policy might be interpreted under another state's law in which the occurrence, generally speaking, is not the manufacture of contaminated peanut butter or products with a common defect. And in that case, then what you would have is this provision would basically take what might be thousands of occurrences and consolidate them into a single occurrence per lot. The problem with that argument, well, there's two problems with that argument. Number one is we all agree that this policy is interpreted under Ohio law. But the question under this line of argument is whether there is a reason for this provision to be written the way it is. And if there is a reason, and if there's ambiguity, then the ruling goes in favor of the insured. That's correct. If the provision is ambiguous, meaning that it is reasonably susceptible to an interpretation that favors the insured, then they're entitled to that interpretation. But what Ohio law also says is that an interpretation that renders a provision in a contract meaningless or superfluous is not a reasonable interpretation and does not create ambiguity. Right, but if their argument is, and you were trying to rebut their argument, their argument is, well, there's a reason for this provision to be written the way it is because we don't know what law will apply. And if another state's law applies, then that might not follow up the Ohio law, which looks at cause in a particular way. And so there is a reason to have this provision written the way it is, even though they urge that this is to be interpreted along their lines. Yeah, and I think, like I said, I think there are two problems with that argument. And the first one is that we are interpreting this under Ohio law. So if some other state's law would apply to what the meaning of an occurrence is, you would also be applying that state's rules of contract interpretation. And I'm not aware of any case, and Smucker doesn't cite any, where a court has found, well, it's entirely superfluous under the law in which it's being interpreted. But if we were to theoretically speak, think it may be some other state's law apply, it might not be superfluous. I mean, we all agree it's Ohio law that governs both the interpretation of what is an occurrence in this particular policy. We all agree that the contract binds the parties, whatever state they're in, whatever state they're being sued in, right? There's no choice of law clause that this is always going to be under Ohio laws. This particular policy is going to govern if you're in Alaska, right? That's true. That's true. And each state will have their own particular choice of law rules to determine which contract law will apply to this. Presumably the parties then need to draft a contract that can exist in a multiplicity of places, right? And this contract explicitly in some places does that, if we're in New York, if we're in Minnesota or somewhere, right? So to think about whether a provision is superfluous, we're thinking about the policy and wherever it could be interpreted, and whether it would have meaning that the parties would put it in there. Yeah, no, I agree with that. And in fact, this policy, I believe the coverage territory is the entire United States. And this case, you know, this case that we're here on involves underlying claims arising from alleged injuries and damage resulting from the consumption or use of peanut butter all over the country. So the underlying claims are all over the place. But we're here and we agree that Ohio law applies to this. But let me now pivot to the second rebuttal to that argument, which is what Ohio, what I think was, well, I guess there's two points I'd like to make here. Is that I think where the flaw in the district court's reasoning was, and it's also repeated in Smucker's arguments on appeal, is that what they did was they basically read the definition of an occurrence in a vacuum, which is an accident including continuous or repeated exposure to substantially same conditions. So read that in a vacuum and conclude, well, that refers to the production of contaminated peanut butter. And then you ask, well, what do we do with this latter batch clause? And you take the definition of occurrence, apply the cause test, and conclude the common defect is a single occurrence. And then say, well, we can't take this latter batch clause and then break up that single occurrence into multiple occurrences. In fact, what the district court should have done is interpret them, harmonize them in the first place. And if you look at the definition of occurrence and you look at that together in the first instance with the latter batch clause, because they're all part of the same policy, they're all part of the same contract, an endorsement is not entitled to any lesser weight than the policy form. In fact, the case law is that to the extent there is a conflict between the two, the endorsement actually would control. But in any event, when you read the two together, it's, I think, abundantly clear that the party's contractual intent here was to basically allocate injuries and damage arising from a common defect by lot when determining the number of occurrences. Did all this come from one batch that came from the factory or whatever it was in Kentucky? Yeah, so the way the policy defines lot is that it says, essentially, it's, however, according to Smucker's own manufacturing process, it's what they consider to be a lot. And according to Smucker's manufacturing processes, the peanut butter produced in any single production day is a lot. So this recall affected 225 production days or 225 lots. Do we know what the cause of the salmonella was? Was it some continuing defect in the manufacturer? I mean, it's the one Kentucky plant. You're saying that it's 200 plus days. But we're treating it, apart from the lot clause, we're treating it as one occurrence, correct? Correct. I mean, that's what the district court did. Well, are you arguing against that? Oh, yes. And that would get to my second point. But what is the cause? I know you're representing the insurance company, so I'll ask the same question to Smucker's. But do we know what was the physical cause for the salmonella for all these days? It's not entirely clear to me. And frankly, I don't even know that there ever was a contaminated product that was ever released out into the public. It was just there was a suspected salmonella contamination at the facility. I think it had to do with air getting into their manufacturing processes. I don't know all the details. I just wanted to hear your perspective. That's fine. And so getting to the I think the question you raised before, like if let's put the lotter batch clause aside, what is an occurrence under Ohio law when you're talking about an occurrence, meaning an accident, including continuous or repeated exposure to substantially the same harmful conditions? And we think that under Ohio law, even if you don't consider the lotter batch clause, that that refers to each claimant's injurious exposure to salmonella contaminated peanut butter, not the upstream manufacturer. I mean, no consumer was exposed to the manufacturing process. Your position on this other issue is that an occurrence is the exposure of a particular consumer to the tainted, we'll call it tainted, peanut butter. That's right. And the district court didn't rule in your favor on that one either. That's correct. That's correct. And the support for that comes from I mean, there's a few district court opinions that we cite in our briefs. There's an appellate court opinion from the Ohio Court of Appeals. It's the William Powell case, which held that in the context of asbestos related injuries, it's each claimant's exposure to asbestos that is the occurrence, not the manufacturer or sale of asbestos related exposure. Is there any reason to treat asbestos differently than food products? I mean, if anything, asbestos would lend itself more to a single occurrence theory than what you have here, because in the asbestos context, you're talking about a design defect. So someone made a decision to use asbestos in the product and produced it and sold it. Here you have a manufacturing flaw, which means that, okay, this manufacturing flaw is affecting multiple batches. These are nonconforming goods and the asbestos products like, okay, the decision to use asbestos, that could be the occurrence. And if I could just add one thing into my rebuttal time, in key citing the William Powell case last night, that case has been followed. That was a first district court of appeals case on February 17th, 2026. The third district court of appeals issued its decision in Copeland Corporation versus Travelers Casualty Insurance Company. The site for that is 2026 Westlaw 447700. And basically what the appellate court has done in both of those cases is in these mass product liability cases, they're both asbestos. In these mass product liability cases, they say, well, it's not the upstream cause that's the occurrence. It's the triggering event that is the occurrence, and the triggering event is each claimant's exposure to the harmful product. And so that's our second point, is that even if you were to put the latter batch clause to the side and not construe the two together, just looking solely at the definition of an occurrence, it would be each claimant's exposure to contaminated peanut butter that would be the operative occurrence. I mean, this is a contract that ACE drafted. Is there a lot of back and forth in doing these policies, or is this kind of like an off-the-shelf policy? You know, the underwriting material isn't in the record. It just strikes me that this is not the most, I mean, obviously hindsight is 20-20, right? But it's not the most novel accident, or however we want to describe it, or alleged problem that would happen with, you know, if you think Smuckers, if you think the creation of any kind of food product, right? And it seems quite, I mean, just arbitrary, even like definition of lot. Like Smuckers could define it, you know, we make a lot every month, you know? And millions of dollars would, even by your argument, would differ. It just seems like you have such a predictable thing that, you know, to the extent that we construe also somewhat against the drafter, it seems very clear that, you know, maybe things like this could have been being covered specifically. I mean, language can always be clear. The question before the court is, given the language that's in this contract, which two sophisticated commercial entities agreed to, is it susceptible to an interpretation that, in our view, reads that clause out of the policy? And also, like I said, when you're talking about the definition of an occurrence, which talks about an accident including continuous or repeated exposure to substantially the same harmful conditions, and that's the William Powell case and that's the more recent Copeland case, it's not the upstream manufacturer and sale of the product, it's each claimant's exposure. And it's the use of the word exposure in the definition of occurrence that was relied on by the Ohio Court of Appeals in both of those cases. But under your theory, if we were applying the lot clause, and if, say, on one day, which you think a day is a lot, correct? I mean, that's according to Smucker, but yes, that's... I thought you were adopting that, too. I am. I am. Absolutely, yes. Okay, so if one day is a lot, and if it turns out that 10,000 people ate that peanut butter from that day and all got salmonella poisoning and died, as opposed to for the 10,000, there would be 250,000 for each of the individuals who, in my hypo, which is obviously extreme, died. That's exactly... If the three things are present, number one, it's a product's liability claim, two, the injuries arise from a common defect, harmful condition, and three, from the same lot, then that's absolutely correct. On the one hand, it's one $250,000 retained limit. And on the other hand, the liability limit above that of a carrier is then limited by the per-occurrence limit, which is $1.75 million, as opposed to the aggregate limit, which is $3 million. So yes. I mean, the answer to your question is yes. Thank you. I keep taking you beyond your time. I'm sorry. Thank you. Good morning, Your Honors. I'm Jonathan Cohen of K&L Gates, representing the plaintiff appellee, the Jam Smucker Company. I want to start where Mr. Wadley ended. He says, language can always be clearer. And indeed, language can be clearer. And indeed, it is the obligation of the insurer to write language in clear and exact ways when they want to limit or diminish, or in this case, eviscerate coverage. And they didn't do that here. That standard is particularly important when they were writing the policy in the shadow of multiple decisions interpreting the same language. The Fourth Circuit in Lafarge said the latter batch provision in that case, which is very similar to this one, unambiguously coverage-enhancing. Eighth Circuit, the same thing in Donaldson. The New Jersey Appellate Court in Diamond Shamrock, same thing. And most directly on point, the Delaware Supreme Court en banc in the ConAgra case said it is at least reasonable that the coverage-enhancing provision, the latter batch provision, has a coverage-enhancing effect. Under that weight of case law, if Lexington, excuse me, if Ace, Lexington's the insurer in ConAgra, if Ace had decided that they wanted to come to a different answer, and they wanted the latter batch provision to override the definition of occurrence and the cause test that this court and Fetzer talks about and other courts, MPD and others, apply, they needed to do it, again, clear and exact language. If there is any uncertainty, if there is any coverage-enhancing interpretation that's even reasonable, even if it's not the most reasonable, even if it's not the only reasonable, Ohio law requires that provision to be given the coverage-enhancing interpretation. And so that's the beginning and end of this case. As to the number of occurrences, the Scott Fetzer case talks about the fact that Ohio law has two important consequences. One is it held the occurrence definition nearly identical to the one here, ambiguous. Second, it said that Ohio applies a cause test. The number of occurrences is determined by the number of causes, not the effects, not the number of claimants, not the number of injuries. And here, that's a really simple application, because as you heard Mr. Wadley say, Ace admits, really relies on the fact that there is a single cause, salmonella contamination at a single product, peanut butter, at a single manufacturing facility in Kentucky, resulting from a single manufacturing defect. And to your question, Judge Moore, there was a root cause analysis. This isn't in the record, but the bottom line is, yes, it was a single error in a machine that caused the contamination. And we believe likely caused it. Again, not in the record. But there's no dispute, what is in the record, that there was a single cause to all of the harm. So the question does get to, does the lot or batch provision, as written in this case, unambiguously override what otherwise would be a single occurrence to sever it, to divide it into 225 separate occurrences, each one subject to a separate $250,000 batch. And the question is, is there a single retained limit deductible that would eliminate coverage, or at least eliminate the vast majority of coverage, absent a single lot having a catastrophic impact? If it's a single occurrence, does that limit then the amount under the policy that you get? Yes. Yes, Your Honor. We have a per occurrence limit of $1.75 million, and an aggregate limit applicable to this of $3 million. So there is a slightly lower amount of coverage if there's a single occurrence, but we also have $100-plus million of excess coverage, which we would also never be able to access, absent a single catastrophic lot or occurrence, absent under ACES interpretation. So under Judge Moore's hypothetical that she gave to your friend, if on any given day, a whole bunch of people all died, would that be a single occurrence?  So if you had a whole bunch of people got Tylenol and died, this kind of extreme hypothetical, you would say, and let's say that happened for 225 days, right, you would still say single occurrence, right, because single cause.  And Smuckers pays $225,000. $250,000. $250,000. But it's then limited to a certain amount of coverage. A single per occurrence limit. A single per occurrence limit, the $1.75 million. Correct. So that's the trade-off. Correct. And then we access our excess coverage above that. Yeah. And look, it's important to note, ACE tries to distinguish the ConAgra case and these other cases by arguing, well, it has a cause condition as well. If that's how they wanted to say ConAgra's language should be different, is that the way they would have explained it? Remember, the structure of this provision, injury is equated to a single occurrence if three conditions are met, the three conditions Mr. Wadley noted. One of those, though, is a single cause. One of those is a single lot. It's an interesting structure because, of course, the policy doesn't trigger unless the injury is caused by an occurrence, and now they're the same thing. So there's a bit of ambiguity already. But are those provisions, conditions to the application of the provision, or operative terms? The provision is squishy on that, to say it nicely. But what Mr. Wadley's argument I heard was, was, well, cause is a condition. If there's only one cause, then the provision is a condition. But then we use lot as an operative provision. But it can't be that way. It's either they're both conditions, if there's one cause and one lot, then we aggregate to a single occurrence, or they're both operative. And then you've got a problem, because if there's a different number of causes and a different number of lots, how do you, that creates an ambiguity. Is that a matter of law or fact? Because it's admitted that if there's any ambiguity, it would be construed in our favor. Do you think if this endorsement had the language that is in some of the separate state endorsements about replacing definitions or things like that, do you think that this would fully replace the general definition of occurrence and would favor the insurance company? No. Well, it's a complicated question, so it's not an easy answer. I mean, first of all, it's not in there, so I get that, but I'm trying to figure out. So if the goal was to create an alternative definition of occurrence, they would have needed to do that, even had they done that, which incidentally their sister company, another company owned by the same parent, did in Donaldson. The Donaldson case does say this amends the definition of occurrence. And that's true in some of the other cases we cited as well. But they chose not to do that, so that's another ambiguity intention. But to the extent that I'm trying to figure out how much do these things conflict, such that you're kind of picking or there's ambiguity or can be read harmoniously or things like that, and that was kind of the import of saying, well, if it said to the extent they conflict, you look at the endorsement, right? Do you see a conflict between the general definition of this, or do you think they read pretty harmoniously? I don't see a conflict, because the way I view the latter batch provision is a coverage-enhancing provision. If the definition of occurrence were to lead you to a multiple occurrence result, this provision has an aggregating purpose. And it can leave you with a multiple occurrence situation, even though you kind of have a single cause? If you have a single cause... In the batch clause endorsement, like B is like you arise from the substantially the same general harmful condition. Isn't that kind of the same cause, or is that not the same cause? Let me answer that question in layers, because there's a couple of different pieces to that. First, Ohio adopts a cause test. So if there's one cause, there's one occurrence, meaning this provision has no need to apply. If there were a law other than Ohio, New York, for instance, that has a different test where a cause isn't what determines the occurrence, then you could have multiple causes. If you do, then this provision applies. The second layer of your question is what happens if there were... Let's say you adopted these asbestos cases and said, okay, well, there are lots of occurrences, which I can talk about in a second. This provision still batches, if you will, by both cause and lot. And that creates an ambiguity, too, because there could be a disconnect. There could be three causes and six lots. Which do you give priority to? And the provision doesn't tell you, and that's itself an ambiguity. So my argument would be, even were there multiple occurrences at the front end on the definition of occurrence, this is ambiguous, and therefore the proper interpretation would be the coverage-enhancing one. As this court said in the Carolina case, Ohio abhors interpretations that would lead to an illusory coverage. And you should make no mistake, that's what we're talking about. The difference between $250,000 of self-insured retention deductible and $56 million is the difference between there being coverage and effectively being very limited or no coverage. So we would look at that issue of those two provisions, and we'd have to address that ambiguity as well. If there were no coverage, if we were to adopt that interpretation, would your excess coverage take effect? If there were no coverage, no, Your Honor. We'd have to exhaust this policy. But there's no coverage because of the feature of the retained amount? Right. We'd have to exhaust the retained limit and the primary policy to get to the excess coverage. So you'd have to spend the – $112.5 million under the two policy years before we get to their policy, and then we'd have to exhaust $3.5 million under the two policies to then get to our excess coverage. I see. Thank you. So let me address very quickly the line of cases in the asbestos world. And to your question, Judge Moore, there is a gigantic difference between those cases and these cases, which is those cases were dealing with a situation where there were multiple products, where asbestos was intended deliberately to be in the products as opposed to a product contamination situation. And so the only unexpected accidental thing from the perspective of the insured was the release of asbestos into the atmosphere, which ended up exposing these individuals. That's what the exposure including provision is for. There is a central principle that this court adopted in Fetzer that is, I don't think, disputed, which is what is the accident that's relevant to the policy needs to be taken from the perspective of the policyholder. And that makes all the sense in the world because this policy is there to cover accidental conduct. It's not there to cover things that were expected or intended. And the structure of the policy, how the policy gets there is it says injury must be caused by the occurrence. In other words, it has to be accidental by the policyholder. This is a product that Smucker manufactures for one purpose, to send it out to people to eat. So the fact that they ate the product wasn't the accident. The fact that they were exposed to the product wasn't the accident. The accident, really the only negligent conduct that Smucker is alleged to have conducted was this manufacturing defect. And so the way that Scott Fetzer addressed this exposure line of cases, it doesn't deal with them expressly, but it does have a clever little phrase. It says, well, it might be a little awkward to say it. That's the word this court used. But what was the exposure? It was the exposure to the manufacturing defect in our case. In their case, it was exposure to a negligent supervision when an individual actor who was negligently hired and supervised did some horrible things that I don't want to discuss in this austere room. And so, again, the Scott Fetzer case, the MPD case, are very relevant. It's also important, again, as I said earlier, Fetzer said this is an ambiguous provision. Luck-Clutch said the reason we're interpreting it this way is because it deals with deductibles and limits. Luck-Clutch, all of the four cases that they cite, Luck-Clutch, the Westfield case, Walter Powell, and the new Copeland case that they identified, all of those are dealing with limits, meaning the more occurrences, the better from the policyholder's interpretation. So all four of those cases are coverage-enhancing. And why is that? Why did Luck-Clutch say, well, we look at deductibles and limits differently? And it's because what Scott Fetzer said is the provision is susceptible to multiple interpretations. We give it the coverage-enhancing one. It's what this court said in Carolina. We very strongly disfavor interpretations that would render coverage illusory. And that's what we have here. Again, I would leave you with this question. If Smucker understood from looking at what happened at ConAgra that this was one of the most significant risks that they had, would they have bought a policy that they had to pay tens if not hundreds of millions of dollars to access? If that was what Ace intended, they had to tell us. They had to tell us clearly, unambiguously, with exact, precise language that left no question, particularly when multiple courts had already told them how a reasonable policyholder would understand it. That's what the district court did. The district court's analysis was correct, and this court should affirm. Thank you. Okay. Thank you very much, Your Honors. Your Honors, just briefly, the argument that Smucker makes assumes that occurrence is defined as cause. It's not. Occurrence is defined as an accident, including continuous or repeated exposure to substantially the same general harmful conditions. That's what has led the Ohio appellate courts in mass product liability cases to say that it's the exposure of the claimant to the harmful product that is the occurrence. And I'll read from this 2026 decision in Copeland Corporation, which says, the use of the term exposure in those clauses, defining occurrence in the policies, leads this court to conclude that, pursuant to the policies, it is the exposure of an individual claimant to asbestos that is the triggering event for an occurrence. Therefore, while a single claimant's bodily injury arising out of continued or repeated exposure to asbestos, under substantially the same general harmful conditions would hypothetically constitute a single occurrence under the policy language, we find that the underlying asbestos claims in this case, to the extent those claims involve multiple claimants with differing exposures, constitute multiple occurrences pursuant to the policies. Substitute salmonella for asbestos, and it's the exact same conclusion. And so the... You're willing to rely upon the decisions in this other field of asbestos. Well, asbestos is a lot closer to this case than Scott Fetzer is. Scott Fetzer was a case that involved an employee that sexually assaulted various people. It wasn't a product liability case at all. And, in fact, in the Copeland Corporation case that I read from, the court declined to apply the causation theory in the mass product liability case, and instead said, no, in these cases, we apply the triggering event theory, the triggering event being the exposure to the harmful conduct. So what the Latter Batch Clause does is it is coverage enhancing, because in the hypothetical that Judge Moore that you raised, where you have thousands of people that are injured from a common harmful condition in a single lot, under these cases, without the Latter Batch Clause, each person's separate exposure would be a separate occurrence and require a $250,000 retained limit. Whereas with the Latter Batch Clause, it takes those thousands and it consolidates them to a single occurrence. But then would they be limited to the $1.7 million? Well, yes, because if it's a single occurrence, they get the benefit of a lower deductible, but it's also a lower limit. So it's kind of like when you read all of these occurrence cases, the parties are always on either side of this, because under some factual scenarios, a single occurrence benefits the carrier because it means a lower limit. Under other factual scenarios, it benefits the insured because it means a lower retention. And so you'll see arguments going both ways all the time. An occurrence needs to be the same for the coverage and for the Latter Batch Clause. That's exactly right. There has to be a consistent interpretation of an occurrence. And that's what these courts have tried to do. And in William Powell and in this Copeland case, what the Ohio courts have said is that in these mass product liability cases, and this involved asbestos, but there's no real reason to distinguish that from this, is that because occurrence is defined as exposure to the harmful condition, it is the claimant's exposure to the harmful condition in the product that is the occurrence. And the Latter Batch Clause takes all those, consolidates them by a lot. Thank you. And it might be of interest for your client to see that we are dealing with some interesting issues here in terms of rewriting the policy for the future. But that is a side remark by me of no importance, but I just had to say it. But then what would we have to do, Your Honor? So we want to do the best given the circumstances, and I thank both of you for your argument, and the case will be submitted.